# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**MICHAEL BEAR,**

      **Plaintiff,**

                              **Case No. 2:14-cv-0043**

      **v.**                          **JUDGE GREGORY L. FROST**

                                      **Magistrate Judge Terence P. Kemp**

**DELAWARE COUNTY, OHIO, et al.,**

      **Defendants.**

## OPINION AND ORDER

This matter is before the Court for consideration of Defendants Derek Beggs and Chris Hughes' motion for summary judgment (ECF No. 125), Defendants Jonathan Burke and Delaware County, Ohio's (the "County") motion for summary judgment (ECF No. 127), Plaintiff's memoranda in opposition (ECF Nos. 136 & 137), and Defendants' replies in support of their motions (ECF Nos. 140 & 142).  For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Beggs and Hughes' motion (ECF No. 125) and **GRANTS** Burke and the County's motion (ECF No. 127).  Regarding the former motion, the Court grants Beggs and Hughes' motion with respect to the § 1983 Fourth Amendment claim and the intentional infliction of emotional distress claim.  The Court denies Beggs and Hughes' motion with respect to the § 1983 substantive due process claims, the § 1983 equal protection claims, the wrongful death claim, and the issue of compensatory damages.

**I.**      **BACKGROUND**

On July 28, 2012, Uriel Juares-Popoca ("Popoca") was driving on Interstate Route 71 ("I-71") in Delaware County, Ohio.  Popoca is from Mexico and had been living in the United States

since March of 2012.  Popoca was 22 years old on July 28, 2012.  He spoke Spanish and did not speak any English.

Shortly after 9:00 p.m. on July 28, 2012, several drivers called 911 to report Popoca's truck for erratic driving.  The callers reported that Popoca's vehicle was driving recklessly and was all over the road.

Delaware County Sheriff's Deputies Derek Beggs and Christopher Hughes (collectively, the "Deputies") learned that there had been reports of an erratic driver.  The Deputies, both of whom were driving Delaware County police cruisers, searched for Popoca on I-71.  Deputy Beggs found Popoca in his truck, which had gotten stuck in the median of I-71.  Popoca was sitting in the driver's seat of the truck when Beggs arrived on the scene.  The truck was running but was not able to move due to its position between a guard rail and guard wires.

Beggs exited his vehicle, approached Popoca, and instructed him to turn off the truck.  Although he did not immediately respond to Beggs' command, Popoca eventually turned off the truck.  Beggs saw a pack of beer and an empty beer can on the floor of Popoca's truck.

Deputy Hughes then arrived at the scene.  Ohio State Patrol Trooper Sean Carpenter arrived shortly thereafter.

Once the truck stopped running, Beggs removed Popoca from the truck and handcuffed him.  Beggs smelled a "faint odor" of alcohol when he removed Popoca from the truck.  Presumably given this fact, the fact that there was beer and an empty beer can in the truck, and the fact that Popoca was not responding to Beggs' commands, Beggs informed Carpenter that Popoca was drunk.

Beggs eventually removed Popoca's handcuffs.  At some point it became clear to the three officers that Popoca spoke little to no English.  Beggs attributed Popoca's failure to

2

respond to his commands to the language barrier.  Beggs testified that, during this time, Popoca was stable on his feet, did not slur his words, had fine motor skills, and was able to sit still on a guardrail post.

None of the officers administered a sobriety test on Popoca.  According to Plaintiff, the officers did not do so because they wanted to avoid getting an interpreter and preparing paperwork at the jail.  According to the Deputies, they did not do so because there were no signs of intoxication (the beer cans in the truck and smell of alcohol notwithstanding).

Instead of obtaining an interpreter, Beggs called Matt Williams, a Delaware County Corrections Officer who spoke Spanish.  Williams told Popoca (via telephone) that he needed to call someone to pick him up.  Williams repeated himself several times on the call.  Popoca said okay and that he understood Williams' instruction.  Beggs later stated to Williams that Popoca had "no idea what was going on."  (ECF No. 113, at PAGEID # 1081.)

Plaintiff contends that this statement was intended to demean Popoca.  Plaintiff notes that Beggs also referred to Popoca as a "stupid idiot" after telling Popoca that he stunk and spraying him with a can of deodorant.

Carpenter left the scene at some point during the stop.  He testified: "Right before I got in my cruiser . . . [Beggs] says, I think we're going to take him to Taco Bell, there should be an interpreter there, and he starts laughing."  (ECF No. 115-1, at PAGEID # 1429.)

Beggs eventually told Hughes to lock Popoca's keys in the truck.  Hughes did so.  Popoca was placed in Hughes' cruiser.  Neither party provides any information about the circumstances under which Popoca was placed in Hughes' cruiser.  Given that neither Hughes nor Beggs were able to communicate with Popoca, however, the Court will assume that Popoca did not verbally consent to being taken to Taco Bell.

Hughes drove Popoca three miles to the Taco Bell on Route 37 in Sunbury, Ohio. Popoca's truck (with the keys locked inside) was left in the median of I-71. Beggs stated over the radio, while laughing, that Hughes was transporting his "new amigo" to Taco Bell to wait for his ride. (ECF No. 113, at PAGEID # 1095.)

Hughes dropped Popoca off at Taco Bell at 9:35 p.m. (shortly before its closing time of 10:00 p.m.). The parties again provide no evidence about the facts leading up to Popoca's exit from the cruiser. Hughes testified that, upon exiting, Popoca thanked him (Hughes) and shook his hand.

Popoca entered the Taco Bell and asked the cashier and other patrons for a ride. Popoca then walked outside and wandered around the parking lot and drive-through window. Both the manager at Taco Bell and the Taco Bell employee manning the drive-through window suspected that Popoca was intoxicated. The manager testified that she smelled alcohol on Popoca.

While Popoca was outside, at approximately 9:45 p.m., the manager locked the door and called 911. At some point during the call, Popoca wandered away from the Taco Bell.

Hughes returned to the Taco Bell following the 911 call. The manager informed Hughes that Popoca had gone across the road to the Wendy's restaurant. Hughes drove to Wendy's but did not locate Popoca.

The road across which Popoca walked was Highway 37. At approximately 10:24 p.m., drivers began calling 911 to report a pedestrian walking in traffic on Highway 37. At approximately 10:34 p.m., about 1.25 miles away from the Taco Bell, Popoca was struck by a vehicle and was killed. The speed limit was 55 miles per hour on the stretch of highway on which Popoca was killed.

4

The administrator of Popoca's estate, Michael Bear ("Plaintiff"), brought this action against Beggs, Hughes, Williams, and Carpenter.  Plaintiff also named the County and Sergeant Jonathan Burke as defendants.  Plaintiff subsequently dropped Williams as a defendant in this action and indicated that he "no longer pursues [his] claims against Sgt. Burke and will file a motion to drop him as a defendant pursuant to Fed. R. Civ. Proc. 21."[1]  (ECF No. ECF No. 137, at PAGEID # 4052.)

On December 2, 2014, the Court granted Carpenter's motion to dismiss.  The Court found that Carpenter did not take any affirmative action that violated Popoca's constitutional rights.  To the contrary, Plaintiff alleged that Carpenter failed to stop Beggs' and Hughes' conduct, which was insufficient to form the basis of a constitutional violation.

The three remaining defendants—Beggs, Hughes, and the County—now move for summary judgment on each of the claims against them.  The Court will consider the parties' arguments below.

## II.     ANALYSIS

### A.  Standard of Review

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court therefore may grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.

---

[1] Plaintiff has not filed a motion to drop Sergeant Burke from this lawsuit.  Because Plaintiff did not oppose Burke's properly-supported motion, however, he fails to meet his burden in demonstrating why Burke should remain in this case.  The Court accordingly **GRANTS** Burke's motion for summary judgment and dismisses him as a defendant in this case.

*See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id*. (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  *Hamad*, 328 F.3d at 234–35 (quoting *Anderson*, 477 U.S. at 251–52).

### B. Analysis

#### 1. Claims Under 42 U.S.C. § 1983

Section 1983 provides a cause of action against any person who, under color of law, subjects another person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.  Plaintiff alleges that Defendants (who were unquestionably operating under of color of law at all times relevant) violated his right to equal protection of the law and his right to receive due process of law pursuant to the Fourteenth Amendment of the United States Constitution.

Defendants invoke the defense of qualified immunity.  This Court recently described the doctrine of qualified immunity as follows:

> [T]he affirmative defense of qualified immunity . . . shields government officials
> 'from liability for civil damages insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person would have known.' "  *Kirby v. Duva*, 530 F.3d 475, 481 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Courts employ a two-pronged inquiry, which can be addressed in any order, to determine whether qualified immunity applies.  *See, e.g., Murray–Ruhl v. Passinault*, 246 F. App'x 338, 342 (6th Cir. 2007) (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001)); *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  "[T]he reviewing court must ask: taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Id.* (internal quotations omitted).  "If a constitutional right was violated, the next, sequential step is to ask whether the right was clearly established."  *Murray–Ruhl*, 246 F. App'x at 342–43.  The right must be "clearly established" in the "more particularized, relevant sense" of the "specific context of the case."  *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002).  Although a plaintiff need not offer precedent with "materially similar facts," the precedent must give "fair warning" that the action in question is unconstitutional.  *Id.*

> In essence, "qualified immunity is inappropriate if it would be clear to a reasonable officer that his conduct was unlawful."  *Murray–Ruhl*, 246 F. App'x at 343.  "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.' "  *City and Cty of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2083 (2011)).

*Kelly v. Sines*, No. 2:14-cv-00307, 2015 WL 5316441, at *5–*6 (S.D. Ohio Sept. 11, 2015).

### a.  Substantive Due Process

The Court first addresses whether, taken in the light most favorable to Plaintiff, the facts show that Beggs and Hughes' conduct violated Popoca's Fourteenth Amendment substantive due process rights.  The Fourteenth Amendment provides, in relevant part, that no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.

The key to any substantive due process claim is a *deprivation* by the state.  Without a deprivation, a state's "failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  *DeShaney v. Winnebao Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989).

Here, it is undisputed that Popoca was killed by a private actor.  The State therefore is not liable for Popoca's death under the general rule articulated in *DeShaney*.

There exist two exceptions to the general rule.  The first is the "custody" or "special relationship" exception:  "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *Id*. at 199–200.  The rationale for this exception is that:

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the . . . Due Process Clause.  . . .  The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf. . . .  In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf . . . which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id*. at 22 (internal citations omitted).  Plaintiff argues that this exception applies because the Deputies took Popoca into custody, which triggered a duty to protect.  Plaintiff further argues that the Deputies violated their duty to protect Popoca.

The second exception is the "state-created danger" exception.  *See, e.g., Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003).  Pursuant to this exception, "state officials may be found to have violated the substantive due process rights of people not within their custody 'when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way.' "  *Id*. (quoting *Ewolski v. City of Brunswick*, 28 7F.3d 492, 506 (6th Cir. 2002)).  Plaintiff argues that both exceptions are satisfied here.

i.      *Custody Exception*

The first issue for the Court is whether Popoca was in "custody."  The Sixth Circuit has defined "custody" in this context as the "intentional application of physical force and show of authority made with the intent of acquiring physical control."  *Id*. (quoting *Ewolski*, 287 F.3d at 506 )).  "[C]ustody requires that the state restrain an individual 'through incarceration, institutionalization, or other similar restraint. . . .  *DeShaney*'s custody exception requires, at a minimum—actual, physical restraint of the suspect by the police.' "  *Pierce v. Springfield Twp., Ohio*, 562 F. App'x 431, 437 (6th Cir. 2014) (quoting *DeShaney*, 489 U.S. at 200)).  Courts deciding whether an individual was in custody ask whether the officers "took the affirmative act of restraining [the individual's] freedom to act on [his or her] own behalf."  *Stemler v. City of Florence*, 126 F. 3d 856, 868 (6th Cir. 1997) (quoting *DeShaney*, 489 U.S. at 200).  "[T]he court's custody assessment relie[s] heavily on the willfulness of the claimant."  *Salyers v. City of Portsmouth*, 534 F. App'x 454, 459 (6th Cir. 2013).

Applying these principles, the Sixth Circuit has found that an individual was not in custody when officers found him walking along the side of the road and offered him a ride, which he accepted.  *See Cartwright*, 336 F.3d at 492.  A custodial duty likewise did not arise when the individual later elected to remain at a store rather than continue to ride with the officers.  *See id*.  In a different case, the Sixth Circuit found that two individuals were not in custody for substantive due process purposes when officers instructed them to get in their cars and leave a college campus.  *See Foy v. City of Berea*, 58 F.2d 227, 231–32 (6th Cir. 1995).

The Sixth Circuit reached the opposite conclusion in a case in which officers arrested an individual, drove him to a dark highway, and "threw him out of the car."  *Davis*, 143 F.3d at 1023; 1026.  In another case, the Sixth Circuit found a custodial relationship to exist when

9

officers physically lifted an individual out of a vehicle, placed her in a second vehicle, and threatened to arrest her if she did not leave in the second vehicle. *See Stemler*, 126 F.3d at 867–68. In both cases, the officers restrained the individuals' freedom—thereby creating a custodial relationship—by forcibly placing the individuals into a situation against their wills.

The custodial relationship triggers a duty. At that point, the state actor has a duty to avoid acting with deliberate indifference to the individual's safety. *See, e.g., Fam. Serv. Ass'n ex rel. Coil v. Wells Twp.*, 783 F.3d 600, 605–06 (6th Cir. 2015). An officer who violates that duty can be liable for injuries that occur as a result of his or her deliberate indifference, even if the injury is inflicted by a private actor. *See, e.g., Salyers*, 534 F. App'x at 459–60.

Whether an officer acted with deliberate indifference is a question of fact for the jury. *Coil*, 783 F.3d at 605–06. "[Deliberate indifference] is a very high standard of culpability, exceeding gross negligence." *Salyers*, 534 F. App'x at 459–60 (quoting *Meier v. Cnty. of Presque Isle*, 376 F. App'x 524, 528 (6th Cir. 2010)). Summary judgment is warranted only if no reasonable jury could find deliberate indifference from the undisputed facts of each case. *Compare Davis*, 143 F.3d at 1026 (finding that a reasonable jury could infer deliberate indifference when officers released an intoxicated man on a dark, unfamiliar highway in the middle of the night); *Stemler*, 126 F.3d at 869–70 (finding that a reasonable jury could infer deliberate indifference when officers forcibly placed a woman into the vehicle of an intoxicated man who had been behaving erratically and violently towards the woman) *with Salyers*, 534 F. App'x at 460 (holding that the facts did not support a finding of deliberate indifference when the officer dropped off a seemingly-sober individual behind a guard rail on a grassy spot alongside a highway after the individual stated that his father was picking him up there).

Importantly for purposes of this case, once an individual is in custody, the officer's duty does not terminate the moment the individual is released from custody.  When an officer releases an individual from custody into a situation against his or her will, the deprivation of liberty continues, and the Sixth Circuit has asked whether the officer acted with deliberate indifference at the time he or she released the individual.  *See Davis*, 143 F.3d at 1025; *Stemler*, 126 F.3d at 867–69.  The Sixth Circuit considered—and squarely rejected—the argument that officers cannot be liable for injuries that occur after the custodial relationship terminates.  *See Davis*, 143 F.3d at 1025 (stating that "an officer's duty exists even after the custodial relationship has ended" and rejecting the officers' argument that they owed no duty of care to an individual they drove to a dark highway and abandoned, when the individual was subsequently hit by a car and injured).

In contrast to *Davis* and *Stemler*, case law suggests that an officer's custodial duty ends when the deprivation of the individual's liberty ends.  In *Salyers*, for example, an officer handcuffed an individual who had been walking across a busy bridge and placed the individual in his (the officer's) cruiser.  534 F. App'x at 456.  The officer did not arrest the individual but refused to allow him to remain on the bridge.  *See id.*  The officer offered to drop the individual off in several different locations, eventually settling on a grassy area protected by a guardrail at the end of the bridge, where the individual said his father would pick him up.  *See id.* at 456–59.  After noting that the individual "was free to choose where to go, and exercised that freedom by refusing [the officer's] alternative suggestions," the Sixth Circuit found that the custodial duty to protect did not exist at the time the officer left the individual in the grass.  *Id.* at 458–59.  The officer therefore was not liable for the subsequent injuries inflicted by a private actor when the individual walked into traffic and was fatally struck by a car.  *Id.* at 459.  *Cf. Cartwright*, 336 F.3d

at 492 (holding that an individual who voluntarily chose to accept a ride from officers and then chose to remain at a convenience store where the officers had stopped was never in custody).

Here, the first issue for the Court is to identify the point at which Popoca was deprived of his liberty such that Beggs and Hughes assumed a custodial duty to avoid acting with deliberate indifference to Popoca's safety.  The Court then must determine if Popoca regained his liberty such that Beggs' and Hughes' custodial duties terminated.

It is undisputed that Beggs physically placed Popoca in handcuffs at some point during the stop in the median of I-71.  Hughes subsequently locked Popoca's keys in his truck and prevented him from leaving the scene on his own accord.  Beggs later stated that he and Hughes were taking Popoca to Taco Bell because there would be an interpreter there (*i.e*., not because Popoca had requested that location or otherwise expressed an interest in going there).  Although there is some dispute about Popoca's ability to communicate with Beggs and Hughes, the facts support a finding that Popoca was not able to effectively communicate due to the language barrier and/or his intoxicated state.  Indeed, Beggs himself stated that Popoca "had no idea what was going on."

This evidence (taken in the light most favorable to Plaintiff) is sufficient to support a finding that Popoca was in custody in the time he was placed in Hughes' cruiser and that Popoca was left at Taco Bell involuntarily.  Although there exists some evidence in support of the opposite conclusion, such as the fact that Popoca allegedly shook Hughes' hand and thanked him upon getting out of the cruiser, Defendants fail to meet their burden in proving that the deprivation of liberty ended as a matter of law.  There exist too many factual questions about the circumstances under which Popoca was placed in Hughes' cruiser and was dropped off at Taco Bell that preclude summary judgment on this issue.

The Court therefore must assume at this stage that the Deputies assumed a custodial duty to avoid acting with deliberate indifference to Popoca's safety. The question becomes whether the evidence supports a finding that the Deputies violated this duty by acting with deliberate indifference when they dropped Popoca off at Taco Bell. If the Deputies violated this duty, then the fact that Popoca's injuries occurred after he was released from custody is without consequence to the Court's analysis. *See, e.g., Davis*, 143 F.3d at 1025.

There exists sufficient evidence in this case for a reasonable jury to conclude that the Deputies acted with deliberate indifference. In the light most favorable to Plaintiff, the evidence supports a finding that the Deputies knew or suspected that Popoca was intoxicated, drove him away from the vehicle in which he had been sitting, dropped him off at a restaurant that was closing shortly, at night, in an unfamiliar location, located on or near a highway where vehicles were traveling at high speeds, without confirming that Popoca had called for a ride or that he was capable of doing so, for no purpose other than to mock Popoca's nationality. The Court finds that a reasonable jury could infer deliberate indifference from these facts.

The Deputies' arguments to the contrary are not persuasive. The Deputies argue that they did not know that Popoca was intoxicated, but the evidence that they had been alerted by several callers that Popoca was driving recklessly, that Beggs saw beer in Popoca's truck and admitted that Popoca smelled of alcohol, that Beggs initially informed Carpenter that Popoca was drunk, that two Taco Bell employees suspected Popoca of being intoxicated, and that Popoca had a blood alcohol level of .23 at the time he was killed, among other circumstantial evidence, creates a question of fact on this issue. A jury must decide whether and the extent to which Beggs and Hughes believed that Popoca was intoxicated.

The Deputies similarly argue that they believed Popoca was calling a friend for a ride but, in the light most favorable to Plaintiffs, the evidence does not support that argument. The evidence supports a finding that Popoca was unable to effectively communicate with Beggs and Hughes that he was calling a friend for a ride or that he understood Williams' instruction to call for a ride. Beggs' statement that Popoca "had no idea what was going on" further undermines the Deputies' argument on this point.

Finally, the Deputies argue that they dropped Popoca off at a safe location such that they could not have been acting with deliberate indifference. This again is a question of fact for the jury. There is no evidence that the officers truly believed that someone at Taco Bell would assist Popoca. Hughes did not inform anyone at Taco Bell of Popoca's situation or ask for assistance. To the contrary, he left Popoca at the restaurant, where the manager promptly locked Popoca out and called 911. Beggs' reference to his "new amigo" and the fact that he laughed when he told Williams he was taking Popoca to Taco Bell also could support a finding that the decision was based on a desire to mock Popoca's Mexican nationality and not on a desire to assist Popoca. The Court therefore cannot conclude that the Deputies did not act with deliberate indifference as a matter of law.

Having found that the evidence supports a finding that the Deputies had and violated a custodial duty to Popoca, the Court necessarily concludes that the evidence supports a finding that the Deputies violated Popoca's Fourteenth Amendment right to substantive due process. The Deputies therefore are not entitled to qualified immunity under the first prong of the qualified immunity analysis.

The next question for the Court is whether this right was clearly established at the time the facts underlying this lawsuit took place. The parties offer no meaningful analysis on this

issue.  Given the case law cited above, the Court finds that the right to be free from deliberate indifference while in custody was clearly established as a matter of law at all times relevant. More specifically, the right to be free from being involuntarily left by law enforcement personnel in an unfamiliar and potentially dangerous location, while intoxicated, after having been in custody, was clearly established at the time the facts underlying this lawsuit took place.  *See generally Davis*, 143 F.3d 1021.  The Deputies therefore are not entitled to qualified immunity on Plaintiff's Fourteenth Amendment substantive due process claim.

As a final matter, the Deputies argue that Plaintiff is "barred" from pursuing the custodial exception to *DeShaney* because he did not explicitly assert it in his first amended complaint. (ECF No. 140, at PAGEID # 4084.)  It is axiomatic, however, that a complaint need only allege facts in support of the asserted claims and not the legal arguments underlying the plaintiff's theory of relief.  The fact that Plaintiff is arguing that the Deputies should have taken additional steps once they took Popoca into custody, rather than releasing him from their physical custody at Taco Bell, in no way precludes Plaintiff from arguing that the custodial exception to *DeShaney* applies in this case.

The Court accordingly **DENIES** the Deputies' motions for summary judgment on Plaintiff's § 1983 substantive due process claim pursuant to *DeShaney*'s custodial exception.

*ii.     State-Created Danger Exception*

As stated above, the state-created danger exception to *DeShaney* applies in non-custodial situations.  Assuming *arguendo* that a jury finds that Popoca was not in custody and/or that he regained his liberty interests at some point during the ride with Hughes, the state-created danger exception becomes relevant.  The Court will address this exception below.

15

To succeed on his Fourteenth Amendment claim under the state-created danger exception, Plaintiff must show:

> 1) An affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; 2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and 3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Cartwright*, 336 F.3d at 493 (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998)).

Regarding the first prong, returning an individual to " 'a situation with a preexisting danger' " does not satisfy the affirmative act requirement. *Walker v. Detroit Pub. Sch. Dist.*, 535 F. App'x 461, 464–65 (6th Cir. 2013) (quoting *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003)); *see also DeShaney*, 489 U.S. at 195–200. An officer's failure to act similarly does not satisfy this prong. *Id.* Recognizing, however, that "[i]t is often difficult in the abstract to characterize whether the government's handling of a situation constitutes an 'affirmative act' or a 'failure to act,' " the Sixth Circuit has "refined the test." *Id.* Courts in this circuit now must determine "whether the victim was safer before the state action than he was after it." *Id.* (quoting *Koulta v. Merciez*, 477 F.3d 442, 445 (6th Cir. 2007) (brackets omitted)). Whether one situation is more dangerous than another is a question of fact for the jury. *See Cartwright*, 336 F.3d at 493.

Regarding the third prong of the state-created danger test, "the state must have known or clearly should have known that its actions specifically endangered an individual." *Id.* (quoting *Kallstrom*, 136 F.3d at 1066). "In cases 'where there is opportunity for reflection and unhurried judgments, a plaintiff must show that the state acted with deliberate indifference.' " *Id.* (quoting

*Arledge v. Franklin Cnty.,* 509 F.3d 258, 263 (6th Cir. 2007)).  As stated above, the question of whether an officer acted with deliberate indifference also is a question of fact for the jury.

The Court first addresses the issue of whether Popoca was safer before Hughes transported him to Taco Bell than he was after it.  In its Opinion and Order dated December 2, 2104 dismissing Carpenter from this case, the Court stated, in dicta, that Plaintiff has not shown how transporting Popoca to Taco Bell increased Popoca's risk of harm.  *See* ECF No. 49, at PAGEID # 233.  The Court's holding in dismissing Carpenter from this action, however, was based on its conclusion that Carpenter did not take any affirmative action because he was not involved in the transport of Popoca to Taco Bell.  The Court accordingly is not bound by its statements regarding the risk of harm Popoca faced before and after Hughes transported him to Taco Bell.  Because those statements were made at the motion to dismiss stage when the Court had allegations (but no facts) before it, they are especially uncompelling here.

Now, with the benefit of a complete record, the Court holds that a reasonable jury could conclude that Popoca was safer before the state action than he was after it.  Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that, when the Deputies encountered Popoca, he was seated in a truck that was disabled in the median of I-71.  The evidence supports a finding that Popoca was not attempting to move or get out of the truck.  Presumably, therefore, Popoca had the opportunity to stay in the truck until becoming sober and taking a rational course of action.  The Deputies removed that opportunity when they transported him away from his vehicle to a restaurant that was closing shortly.  Although Popoca could have called for a ride from the restaurant, a reasonable jury could conclude that the transport to Taco Bell increased the risk that Popoca would walk into the highway (perhaps in search of his vehicle) and be struck by

a car.  This fact prevents the Court from holding that the state-created danger exception does not apply as a matter of law.[2]

The Deputies' arguments to the contrary rely on three distinguishable cases.  Plaintiff analogizes this case to *Cartwright*, in which officers transported an individual who was walking along the side of the road on a foggy night to the parking lot of a well-lit gas station.  *See* 336 F.3d at 490–92.  The court found that "[n]o reasonable jury could find that the parking lot was more dangerous than the shoulder of [the road]."  *Id*. at 493.  Because the individual had been walking when the officers found him, however, the risk of getting hit by a vehicle was no greater after he was dropped off at the gas station than before.  That fact distinguishes *Cartwright* from the facts of this case, in which a reasonable jury could conclude that separating Popoca from his disabled vehicle and depositing him at a restaurant that was closing shortly increased the risk that he would wander into the road and be hit by a car.

Plaintiff likewise analogizes this case to two cases outside of this circuit: *Geurrero v. Piotrowski*, 67 F. Supp. 3d 963 (N.D. Ill. 2014) and *Lizak v. Village of Campton Hills*, No. 09 C 4283, 2010 WL 432308 (N.D. Ill. Feb. 2, 2010).  In both cases, officers encountered and arrested individuals who were driving under the influence.  *See Geurrero*, 67 F. Supp. 3d at 965–66; *Lizak*, 2010 WL 432308, at *4–*5.  The officers prevented the individuals from operating their vehicles, which posed a serious risk of harm to both them and the public, and transported them to a gas station and a police station, respectively.  *See Geurrero*, 67 F. Supp. 3d at 965–66; *Lizak*, 2010 WL 432308, at *4–*5.  The courts in both cases found that the state-created danger

---

[2] The fact that other officers testified that Taco Bell was a safer location than the median of I-71 is relevant evidence but is not dispositive of this issue.  The Deputies are free to present this testimony to a jury in arguing that they did not increase the risk of harm to Popoca.  This evidence does not, however, compel that conclusion as a matter of law.

exception did not apply because the officers did not create or increase the risk of danger of private violence.  *See Geurrero*, 67 F. Supp. 3d at 969–72; *Lizak*, 2010 WL 432308, at *4–*5.

Here, the Court agrees with the Deputies that they did not create the risk of danger to Popoca or contribute to his intoxication.  The Court disagrees, however, that *Geurrero* and *Lizak* are directly on point.  The *Geurrero* and *Lizak* holdings rely on the fact that the individuals faced a serious risk of harm at the time the officers encountered them.  The evidence in this case— which could support a finding that Popoca was seated in disabled vehicle and was showing no signs of leaving or moving the vehicle—do not compel the same conclusion.  The circumstances of this case accordingly leave room for a jury finding that the officers increased the risk of harm that Popoca faced.

Having found that the evidence could support a finding that the state-created danger exception applies in this case, the Court proceeds to consider the remaining prongs of the state-created danger test.  The Deputies argue that the danger Popoca faced was "the same for the public as a whole and not a special danger to Popoca," (ECF No. 140, at PAGEID # 4080), but this argument is without merit.  The Deputies took specific action with respect to Popoca that arguably increased the risk to him of private violence.  Such action is sufficient to satisfy the second prong of the state-created danger test.

Regarding the third prong, the Court has already concluded that the evidence could support a finding that the Deputies acted with deliberate indifference to Popoca's safety.  The Deputies therefore are not entitled to summary judgment on this issue.

For these reasons, the Court concludes that there exist material questions of fact on the issue of whether the Deputies violated Popoca's Fourteenth Amendment substantive due process rights under the state-created danger exception to *DeShaney*.  The Deputies do not argue that this

right was not clearly established in the particular, relevant context of this case.  The Court accordingly finds that the Deputies are not qualifiedly immune from this claim.  The Deputies' motion for summary judgment on the Fourteenth Amendment substantive due process claim, state-created danger exception, is **DENIED**.

> b.  <u>Equal Protection</u>

Defendants move for summary judgment on Plaintiff's Fourteenth Amendment equal protection claim by offering the two-sentence argument that "there is no evidence in the record that defendants acted disparately towards Mr. Popoca or treated white suspects more favorably.  . . . Mr. Popoca was treated better – he was not arrested and jailed for driving while intoxicated, he was given a free pass."  (ECF No. 127, at PAGEID # 3186.)  The Court disagrees and finds that the evidence in this case could support a finding that the Deputies violated Popoca's Fourteenth Amendment right to equal protection.

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  To prove an equal protection violation in this context, Plaintiff must show that Popoca was subjected to unequal treatment based on his national origin.  *See, e.g., Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533 (6th Cir. 2002).

It is without consequence that the initial stop of Popoca was lawful and/or that Popoca had no legal right to be taken into custody.  The Equal Protection Clause provides a degree of protection independent of those considerations.  That is: the Equal Protection Clause prevents a state actor from making the decision about whether to stop an individual or take that individual into custody on the basis of the individual's national origin, among other protected characteristics.  *See, e.g., id.* ("[A]n officer's discriminatory motivations for pursuing a course of

action can give rise to an Equal Protection claim, even where there are sufficient objective indicia of suspicion to justify the officer's actions under the [Constitution] . . . ." (citing *Whren v. United States*, 517 U.S. 806, 813 (1996))); *cf. DeShaney*, 489 U.S. at 197 n. 3 ("The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause.").  Although the Court acknowledges that this case is unique in that the Deputies did not punitively apply the criminal laws against Popoca, it still must determine whether the Deputies subjected Popoca to unequal treatment by deciding not to take him into custody but to leave him at Taco Bell instead.

The most analogous line of cases involves selective enforcement of facially neutral criminal laws.  To prove his claim under the standard set forth in these cases, Plaintiff "must demonstrate that the challenged law enforcement practice 'had a discriminatory effect and that it was motivated by a discriminatory purpose.' "  *Farm Labor Org. Comm.*, 308 F.3d at 533–34. To establish discriminatory effect, Plaintiff must show that similarly-situated individuals of a different national original were not treated in the same manner that Popoca was treated.  *Cf. id*. at 534 (setting forth the standard in a race case) (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)).  The Sixth Circuit outlined this standard as follows:

> A claimant can demonstrate discriminatory effect by naming a similarly situated individual who was not investigated or through the use of statistical or other evidence which "address[es] the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." *Chavez v. Ill. State Police,* 251 F.3d 612, 638 (7th Cir. 2001).

*Farm Labor Org. Comm*., 308 F.3d at 534.

> Discriminatory purpose, on the other hand

> can be shown by demonstrating that the " 'decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.' " *Wayte*, 470 U.S. at 610, 105 S.Ct. 1524 (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279,

99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)).  Determining whether official action was motivated by intentional discrimination "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another."  *Washington v. Davis*, 426 U.S. 229, 242 (1976).

*Farm Labor Org. Comm.*, 308 F.3d at 534.

Here, the evidence supports a finding of discriminatory purpose.  That the Deputies elected to leave Popoca at Taco Bell and noted, while laughing, that there might be an interpreter there, itself supports the inference that the Deputies selected or reaffirmed a particular course of action at least in part because of Popoca's national origin.  References to Popoca as the Deputies' "amigo" (although perhaps not demeaning by itself) is further evidence that a jury must consider in determining whether the Deputies impermissibly factored Popoca's national origin into their decision making.  And finally, evidence that Beggs referred to Popoca as a "stupid idiot" to another officer could support a finding that the Deputies intended to demean Popoca, which—combined with the other evidence in this case—could support a finding that they intended to demean Popoca on account of his national origin.  The Deputies' arguments to the contrary on this point are factual arguments for a jury.

The more difficult question is whether Plaintiff can establish discriminatory effect.  Despite arguing at length that the Deputies acted with a discriminatory purpose, Plaintiff does not mention the discriminatory effect prong of the analysis.  Nor does Plaintiff identify a similarly-situated individual who was treated differently than Popoca was treated.  Defendants argue that this lack of comparative evidence is fatal to Plaintiff's claim.

Plaintiff does, however, cite the following evidence: that County policy allowed officers to release intoxicated individuals only into the custody of someone who is sober, that another

officer had never heard of deputies dropping off intoxicated persons at a restaurant, and that Beggs and Hughes were found to have violated County policies with respect to their treatment of Popoca. Viewed in the light most favorable to Plaintiff, a jury could conclude that other individuals were treated according to policy and therefore were not dropped off, while intoxicated, at a restaurant, without a sober individual to care for them. Plaintiff's evidence therefore supports a finding that the Deputies treated Popoca in a different manner than they treated similarly-situated individuals of a different national origin.

The Deputies' only remaining argument on this point is that they did not know Popoca was intoxicated. The Deputies state that they were in a no-win situation because detaining a non-intoxicated person would have allowed Popoca to argue that he was detained because of his national origin. As stated above, however, there is sufficient evidence for a jury to conclude that the Deputies knew Popoca was intoxicated. These arguments therefore must be reserved for the factfinder and do not warrant summary judgment.

The Deputies do not argue that the equal protection rights at issue were not clearly established at the time of their encounter with Popoca. The Court accordingly **DENIES** the Deputies' request for qualified immunity on this claim. The Deputies' motion for summary judgment on Plaintiff's Fourteenth Amendment equal protection claim is **DENIED**.

c. <u>Fourth Amendment Right to be Held Safely</u>

Plaintiff's Amended Complaint references a "right to be held safely under the Fourth Amendment." (ECF No. 93, at PAGEID # 817.) In response to Defendants' motions seeking summary judgment on all § 1983 claims, Plaintiff does not reference his Fourth Amendment claim or otherwise indicate that he is still pursuing this claim. The Court accordingly **GRANTS**

the Deputies' motion for summary judgment on any Fourth Amendment § 1983 claim asserted in

Plaintiff's Amended Complaint.

> d.  The County's Liability

The County moves for summary judgment on Plaintiff's claim that it is liable for Beggs'

and Hughes' actions under § 1983.  Where, as here, a plaintiff alleges that a municipality is liable

under § 1983, the plaintiff must prove that the municipality caused the constitutional violation.

*Miller v. Meyer*, No. 2:14-cv-101, 2014 WL 5448348, at *6 (S.D. Ohio Oct. 23, 2014).  The

standard for causation in such circumstances is well settled:

> The United States Supreme Court spelled out the causation rules as they
> relate to municipal entities in *Monell v. New York City Department of Social
> Services,* 436 U.S. 658, 692 (1978). Under *Monell*, "[a] municipality or other
> local government may be liable ... if the governmental body itself 'subjects' a
> person to a deprivation of rights or 'causes' a person 'to be subjected' to such
> deprivation." *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011) (quoting
> *Monell*, 436 U.S. at 691). If the municipality did not directly cause the injury,
> then a plaintiff "who seek[s] to impose liability on local governments under §
> 1983 must prove that 'action pursuant to official municipal policy' caused their
> injury." *Id*. (quoting *Monell*, 436 U.S. at 691). In other words, in order for a
> municipal entity to be liable for a § 1983 violation, that entity must have caused
> the violation either directly through municipal action or indirectly through one of
> its employees following official municipal policies.

*Id*.

> There are at least four avenues a plaintiff may take to prove the existence of a
> municipality's illegal policy or custom. The plaintiff can look to (1) the
> municipality's legislative enactments or official agency policies; (2) actions taken
> by officials with final decision-making authority; (3) a policy of inadequate
> training or supervision; or (4) a custom of tolerance or acquiescence of federal
> rights violations.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell*, 436 U.S. 694;

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); *Stemler*, 126 F.3d at 865; *Doe v.

Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996)).

Regarding the fourth avenue, the Sixth Circuit has identified four factors that a plaintiff must prove to establish a custom of tolerance or acquiescence. They are:

> (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the moving force or direct causal link in the constitutional deprivation.

*Id*. (citing *Doe*, 103 F.3d at 507). A municipality's failure to investigate an officer's unconstitutional conduct satisfies this test if the plaintiff can show that the municipality historically failed to investigate or discipline similar conduct such that the municipality's inaction represents an unofficial custom of tolerance. *See, e.g., Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985); *see also Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1247–48 (6th Cir. 1989). In such cases, the municipality's prior inaction can be said to have caused the subsequent misconduct.

Here, Plaintiff argues that the County is liable for Beggs' and Hughes' misconduct because it failed to adequately investigate that misconduct. Plaintiff notes that the County investigated the incident and terminated Beggs' and Hughes' employment but later withdrew the terminations, allowed Beggs and Hughes to resign, provided neutral letters of reference, and paid Hughes $10,000. Plaintiff argues that this course of action "ratified" Beggs' and Hughes' actions on the evening of July 28, 2012, and shows that Beggs' and Hughes' conduct was consistent with municipal policy.

Plaintiff's argument is not well taken. Although Plaintiff cites *Marchese* and *Leach*, he does not argue that a history of municipal inaction exists in this case. Instead, relying solely on *Wright v. City of Canton, Ohio*, 138 F. Supp. 2d 955 (N.D. Ohio 2001), Plaintiff argues that a single-incident failure to adequately investigate effectively "ratifies" the subordinate's conduct

25

and binds the municipality.  Several courts in this circuit have rejected that argument because it ignores the necessary casual connection between the municipal inaction and the unconstitutional conduct.  *See, e.g., Thomas*, 398 F.3d at 429 ("[A]ppellants must show not only that the investigation was inadequate, but that the flaws in this particular investigation were representative of (1) a clear and persistent pattern of illegal activity . . . ."); *Daniels v. City of Columbus*, No. C2-00-562, 2002 WL 484622, at *5–*7 (S.D. Ohio Feb. 20, 2002) (distinguishing *Leach* and *Marchese* in a case involving a single-incident failure to investigate because the failure could not logically be the moving force behind the constitutional deprivation).  Indeed, another judicial officer in this district has criticized *Wright* for failing to appreciate this connection.  *See Greenlee v. Miami Tp., Ohio*, No. 3:14-cv-173, 2015 WL 631130, at *8 n.5 (S.D. Ohio Feb. 12, 2015).

The Court finds these latter cases to be persuasive and rejects the *Wright* court's holding. There exists no causal connection between Beggs' and Hughes' conduct on July 28, 2012 and the County's subsequent investigation of that conduct.  Without any evidence of the County's handling of similar investigations, Plaintiff cannot establish that the County's investigation in this case played any role in the events of July 28, 2012.  Plaintiff therefore cannot establish a policy or custom that caused the alleged violation.

Plaintiff offers a different but related argument that the County's failure to adequately investigate and/or discipline Beggs and Hughes shows that Beggs and Hughes acted in accordance with County policy on July 28, 2012.  But it does not logically follow that a failure to adequately investigate and/or discipline individuals in one particular instance affirmatively proves that the individuals acted according to municipal policy.  That is especially true in this case, in which the County terminated Beggs' and Hughes' employment following the

investigation but later allowed them to resign with a neutral reference (and, in Hughes' case, a $10,000 payment).  The fact that the County required Beggs and Hughes to resign suggests that they acted against County policy and not pursuant to it.

The Court concludes that the County is entitled to summary judgment on Plaintiff's § 1983 claims.  Plaintiff does not argue that the County is liable under his state-law theories of recovery.  The Court accordingly **GRANTS** the County's motion in its entirety.

### 2. *State-Law Claims*

Plaintiff asserts state-law claims against the Deputies for wrongful death and for intentional infliction of emotional distress.  The Deputies argue that they are immune from such claims pursuant to Ohio Revised Code § 2744.03.  The Court will address this argument before addressing the elements of Plaintiff's claims.

### a. State-Law Immunity

Ohio Revised Code §2744.03 provides that a political subdivision employee is immune from liability unless one of the following applies:

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

Ohio Rev. Code § 2744.03(6).  Plaintiff argues that section (b) applies in this case because the evidence supports a finding that the Deputies acted in a wanton or reckless manner.

The Sixth Circuit has stated that the "wanton or reckless" standard is a "slightly highly" standard of liability than § 1983's deliberate indifference standard. *Stefan v. Olson*, 497 F. App'x 568, 581 (6th Cir. Aug. 31, 2012). " 'Wanton' conduct is generally 'the failure to exercise any care whatsoever,' characterized by perversity of being 'conscious that the conduct will in all probability result in injury.' " *Range v. Douglas*, 763 F.3d 573, 585 (6th Cir. Aug. 15, 2014) (quoting *Fabrey v. McDonald Vill. Police Dep't*, 70 Ohio St.3d 351, 639 N.E.2d 31, 35 (1994)) (brackets omitted). " 'Reckless' means that the conduct was committed with knowledge or with reason to know of facts that would cause a reasonable person to realize that the conduct in question creates an unreasonable risk that is greater than mere negligence." *Id*. (quoting *Rankin v. Cuyahoga Cnty. Dep't of Children & Family Servs.*, 118 Ohio St.3d 392, 889 N.E.2d 521, 527 (2008)). "[T]he question of whether a government employee has acted in a reckless or wanton manner is a question of fact for a jury." *Id*.

Here, the Court cannot conclude that § § 2744.03(6)(b) immunizes the Deputies from suit as a matter of law. The Deputies' argument that they did not act wantonly or recklessly depends on their version of the facts: they did not know Popoca was intoxicated, they believed he was calling a friend for a ride home, and they intended to give Popoca a break by dropping him off at Taco Bell rather than taking him into custody, among other facts. But as stated above, the evidence supports a jury finding that the Deputies knew Popoca was intoxicated, believed he had "no idea what was going on," knew he was unable to communicate and/or understand instructions to call for a ride home, took no steps to verify that he would do so, and left him in an unfamiliar location near a dangerous highway at night, all for the purpose of making a joke about his Mexican nationality. A jury must decide which version of the facts to believe and, if they

accept Plaintiff's version, whether the Deputies' conduct was wanton or reckless. The Court therefore cannot apply § 2744.03(6)(b) at this stage of the litigation.

b. Intentional Infliction of Emotional Distress ("IIED")

Turning to the elements of Plaintiff's claims, the Court finds that the IIED claim fails for the simple reason that there is no evidence of emotional distress in this case. In response to the Deputies' argument that Plaintiff cannot satisfy this element of his claim, Plaintiff states:

> Mr. Popoca suffered from humiliation and embarrassment with Defendant Beggs sprayed him with deodorant, Hughes shouted Amiga, and the officers laughed at dropping him at the Taco Bell at his own expense. Mr. Popoca went on to suffer humiliation, embarrassment, distress, confusion, and disorientation when he was dropped three miles away at Taco Bell shortly before closing time . . . . Mr. Popoca experienced terror and distress when he was almost hit by a car crossing the street in front of the Taco Bell.

(ECF No. 136, at PAGEID #4043–44.) Plaintiff cites evidence that these exchanges and events occurred, but no evidence that they caused emotional distress. Plaintiff essentially asks the Court to infer that Popoca suffered emotional distress as a result of these exchanges and events.

Plaintiff does not cite any legal authority for the proposition that the Court may do so. To the contrary, Plaintiff cites a case in support of his position in which the court explicitly found that the plaintiff suffered humiliation and embarrassment. *See id.* (citing *Phillips v. Mulfleh*, 95 Ohio App. 3d 289 (6th Dist. 1994)).

Plaintiff's IIED claim fails absent evidence of emotional distress. *See, e.g., Hartwig v. Nat'l Broadcasting Co.*, 863 F. Supp. 558, 562 (N.D. Ohio 1994). Plaintiff's claim fails for another reason as well: there is no evidence that Popoca was aware of or was able to comprehend the conduct about which Plaintiff complains. Plaintiff argues that Popoca suffered "terror and distress" attempting to cross the street, for example, while at the same time arguing that Plaintiff had "no idea what was going on" and was unable to comprehend the dangerous situation into

29

which the Deputies placed him.  Indeed, if Popoca had been able to comprehend the danger of crossing the roadway, then Plaintiff's claim that the Deputies acted with deliberate indifference falls apart.  Plaintiff's claim that Popoca was humiliated by the Deputies' decision to drop him off at Taco Bell likewise has no basis when the gravamen of Plaintiff's case is that Popoca could not understand the Deputies due to the language barrier (and therefore could not understand or appreciate their instructions to call for a ride home).

Put simply, even if the Court could allow the jury to infer emotional distress based solely on the events that transpired, the facts in this case do not support such a finding.  The Court accordingly **GRANTS** the Deputies' motion for summary judgment on this claim.

### c.  Wrongful Death

Plaintiff's wrongful death claim presents a closer call.  The Deputies argue that Plaintiff cannot establish the elements of this claim.  The Deputies further argue that Plaintiff's claim is barred because Popoca assumed the risk he faced when he voluntarily became intoxicated and because an intervening act of negligence (by the motorist who struck Popoca) caused Popoca's death.  As explained below, however, all of these arguments present questions of fact for a jury.

A wrongful death claim in Ohio has three elements: (1) a duty owed to the decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death.  *See, e.g., Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St. 3d 86, 92, 529 N.E.2d 449 (1988).  The Deputies first argue that they did not owe a duty to Popoca for the same reasons as those advanced in their § 1983 custody arguments.  The Court rejects those arguments for the same reasons it provided above.

The Deputies next argue that their actions or omissions did not proximately cause

Popoca's death.  Proximate cause is:

> that which immediately precedes and produces the effect, as distinguished from a remote, mediate, or predisposing case; that from which the fact might be expected to follow without the concurrence of any unusual circumstances, that without which the accident would not have happened, and from which the injury or a like injury might have been anticipated.

*Jeffers v. Olexo*, 43 Ohio St. 3d 140, 143, 539 N.E.2d 614 (1989) (citing *Corrigan v. E.W.*

*Bohren Transport Co*. (C.A.6, 1968), 408 F.2d 301, 303.  "The question of whether [the

defendant] owed a duty of care to [the plaintiff] thus turns on the foreseeability of the injury and

whether any acts or omissions of [the defendant] proximately caused the death."  *Id*.  "There may

be more than one proximate cause of an injury."  *Taylor v. Webster*, 12 Ohio St. 2d 53, 57, 231

N.E.2d 870 (1967).  Whether a defendant's actions proximately caused a plaintiff's injury (i.e.,

whether the injury was foreseeable from the defendant's conduct) is a question of fact for the

jury.  *See, e.g., id*.  In other words, summary judgment is improper on this issue unless no

reasonable jury could find in Plaintiff's favor.

The Deputies do not argue that Popoca's death was not foreseeable at the time they

dropped him off at Taco Bell.  Instead, they argue that Popoca assumed the risk he faced when

he voluntarily became intoxicated, and that an intervening act of negligence (by the driver that

struck Popoca) was the proximate cause of his death.

When "intervening events are of such a kind that no foresight could have been expected

to look out for them, the defendant is not to blame for having failed to do so."  *Id*. (quoting

*Elliott v. Nagy* (1986), 22 Ohio St.3d 58, 61, 22 OBR 77, 79, 488 N.E.2d 853, 855).  The issue of

intervening liability, therefore, turns on foreseeability.  As stated above, foreseeability generally

is a question of fact for a jury.

Plaintiff argues that the motorist who struck Popoca acted negligently because he testified that he was reaching for pretzels at the time of the accident.  A reasonable jury, however, could find that such distracted driving was foreseeable.  The Court therefore cannot conclude that the motorist's negligence (if any) was an intervening cause that relieves the Deputies from liability as a matter of law.

The Deputies attempt to paint Popoca's intoxication as a second "intervening act" that caused the accident, but that makes no logical sense given that the intoxication had already occurred at the time the Deputies left Popoca at Taco Bell.  The Deputies further argue that Popoca's claim is barred because he voluntarily assumed the risk he faced when he chose to become intoxicated and walk along a roadway at night.  The legal proposition the Deputies advance is "primary" assumption of the risk, which applies "where there is a lack of duty owed by the defendant to the plaintiff."  *Anderson v. Ceccardi*, 6 Ohio St. 3d 110, 114, 451 N.E.2d 780 (1983).  The Court has already rejected the Deputies' arguments that they did not owe a duty to Popoca.  Primary assumption of the risk therefore does not apply in this case.

Ohio's comparative negligence scheme subsumes any remaining assumption of the risk defense.  *Id.*  The question of whether Popoca's own negligence (if any) is greater than the Deputies' negligence (if any) such that it bars Plaintiff's recovery is one for the jury.  *See id.*; Ohio Rev. Code § 2315.19.

Factual questions therefore preclude summary judgment on Plaintiff's wrongful death claim.  The Court **DENIES** the Deputies' motion for summary judgment on this claim.

d.  Compensatory Damages

The final issue for the Court is whether Popoca's status as an illegal alien in the United States bars or otherwise affects Plaintiff's ability to recover lost wages as damages for his wrongful death claim.  Citing *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 151, 122 S. Ct. 1275 (2002) and *Veliz v. Rental Service Corp., USA, Inc*., 313 F. Supp. 2d 1317, 1336–37 (M.D. Fla. 2003), the Deputies argue that the federal Immigration Reform and Control Act ("IRCA") preempts Ohio law and prevents courts from awarding lost wages to aliens who had been working illegally in the United States.  This issue is one of first impression in Ohio.

The Court begins its analysis with the text of Ohio's damages statute.  That statute provides, in relevant part:

> [A](2)  The jury . . . may award damages authorized by division (B) of this section, as it determines are proportioned to the injury and loss resulting to the beneficiaries described in division (A)(1) of this section by reason of the wrongful death . . .
>
> . . .
>
> (b)(i)  In determining the amount of damages to be awarded, the jury . . . may consider all factors existing at the time of the decedent's death that are relevant to a determination of the damages suffered by reason of the wrongful death.
>
> . . .
>
> (B) Compensatory damages may be awarded in a civil action for wrongful death and may include damages for the following:
>
> (1)  Loss of support from the reasonably expected earning capacity of the decedent; . . .

Ohio Rev. Code § 2125.02.

The Deputies argue that, at the time of his death, Popoca was an alien working illegally in the United States.  The Deputies cite testimony from Popoca's father that he and Popoca entered

the United States illegally and obtained a forged permanent residency card and a false social security card. Popoca's father testified that neither he nor his son signed up for social security.

Plaintiff does not dispute this contention. Plaintiff does, however, argue that Popoca's father's testimony lacks foundation because it relates to the year 2007, when he and Popoca entered and worked in the United States. Plaintiff argues that Popoca subsequently returned to Mexico and reentered the United States in 2012 without his father. Plaintiff does not offer any evidence that Popoca was in the United States legally in 2012, was working legally, had obtained employment by any means other than forged documents, and/or that Popoca was in the process of obtaining the legal right to work in the United States.

Assuming *arguendo* that Popoca was working illegally in the United States and was able to do so by virtue of the forged documents he obtained in 2007, the question becomes whether he is barred from seeking lost wages based on the illegally-earned income. The Supreme Court's decision in *Hoffman Plastics Compounds, Inc. v. National Labor Relations Board*, 535 U.S. 137 (2002), is central to this dispute.

In *Hoffman*, an employer terminated an individual's employment. 535 U.S. at 140. Years later, the National Labor Relations Board ("NLRB") found that the termination was done in retaliation for union activities such that the employer violated federal labor laws. *Id*. It was also discovered during this time that the individual was an illegal alien who had presented fraudulent paperwork in order to obtain employment in the United States. *Id*. at 141. The question for the Supreme Court was whether the employer should be required to pay the individual backpay dating from the illegal termination or whether an award of backpay conflicted with the federal immigration statutory scheme. *See id*. at 142.

The Supreme Court held that the NLRB could not force the employer to award backpay to the illegal alien worker.  *Id*. at 150.  The Court set forth the relevant provisions from the IRCA, which

> establish[es] an extensive employment verification system, § 1324a(a)(1), designed to deny employment to aliens who (a) are not lawfully present in the United States, or (b) are not lawfully authorized to work in the United States, § 1324a(h)(3). . . .  To enforce it, IRCA mandates that employers verify the identity and eligibility of all new hires by examining specified documents before the begin work.  If an alien applicant is unable to present the required documentation, the unauthorized alien cannot be hired. § 1324a(a)(1).
>
> Similarly, if an employer unknowingly hires an unauthorized alien, or if the alien becomes unauthorized while employed, the employer is compelled to discharge the worker upon discovery of the worker's undocumented status. § 1324a(a)(2). Employers who violate IRCA are punished by civil fines, § 1324a(e)(4)(A), and may be subject to criminal prosecution, § 1324a(f)(1). IRCA also makes it a crime for an unauthorized alien to subvert the employer verification system by tendering fraudulent documents. § 1324c(a). It thus prohibits aliens from using or attempting to use 'any forged, counterfeit, altered, or falsely made document' or 'any document lawfully issued to or with respect to a person other than the possessor' for purposes of obtaining employment in the United States. §§ 1324c(a)(1)–(3). Aliens who use or attempt to use such documents are subject to fines and criminal prosecution. 18 U.S.C. § 1546(b). . . .

*Id*. at 147. (internal quotations omitted).  The Court found that "awarding backpay in a case like this not only trivializes the immigration laws, it also condones and encourages future violations." *Id*.  It therefore concluded that "allowing the Board to award backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA." *Id*.

Courts in other jurisdictions have applied *Hoffman* to cases involving state-law claims for lost wages.  In *Veliz v. Rental Serv. Corp. USA, Inc*., relying on *Hoffman*, the court found that allowing an award of lost wages based on wages an individual would have earned as an illegal alien working in the United States would conflict with the immigration laws.  313 F. Supp. 2d 1317, 1336–37 (M.D. Fla. 2003).  The *Veliz* court did not discuss the doctrine of preemption;

rather, it made the common sense determination that it could not condone an award of lost wages when the individual was an undocumented alien working in the United States at the time of his death.  *See id*. at 1332–37.  *See also Hernandez-Cortez v. Hernandez*, No. 01-1241, 2003 WL 22519678, at *7 (D. Kan. Nov. 4, 2003) (holding that an individual pursuing a negligence claim could not recover lost income based on projected earnings in the United States due to his status as an illegal alien).

New York's Court of Appeals, in contrast, approached the issue by asking whether IRCA preempted state tort and labor laws.  *See Balbuena v. IDR Realty LLC*, 845 N.E.2d 1246 (N.Y. 2006).  The court distinguished *Hoffman* on the grounds that the case before it did not involve personal injury or a situation in which the worker had obtained employment through fraudulent paperwork.  *See id*. at 1253–54.  The court stated:

> [A]ny conflict with IRCA's purposes that may arise from permitting an alien's lost wage claim to proceed to trial can be alleviated by permitting a jury to consider immigration status as one factor in its determination of the damages, if any, warranted under the Labor Law.  An undocumented alien plaintiff could, for example, introduce proof that he had subsequently received or was in the process of obtaining the authorization documents required by IRCA and, consequently, would likely be authorized to obtain future employment in the United States. . . . In other words, a jury's analysis of a future wage claim proffered by an undocumented alien is similar to a claim asserted by any other injured person in that the determination must be based on all of the relevant facts and circumstances presented in the case.

*Id*. at 1259.  The Court of Appeals for the Second Circuit reached the same result in a case with similar facts as those presented in *Balbuena*.  *See Madeira v. Affordable Housing Foundation*, 469 F.3d 219, 240–49 (2d Cir. 2006).

As these cases show, even courts that allow the issue to go to a jury agree that an individual's immigration status is relevant to the issue of lost wages.  *See, e.g., id*. (suggesting that a jury instruction regarding the "worker's removability" alleviates but does not eliminate the

tension implicit in an "award that presumes continued employment in violation of IRCA").  Two courts in the Southern District of Ohio have so noted but have not reached the ultimate issue of whether lost wages are recoverable in such cases.  *See Davila v. Grimes,* No. 09–cv–407, 2010 WL 1737121, at *3 (S.D. Ohio Apr. 29, 2010) ("At a minimum, it is clear that plaintiff's immigration status is relevant to his claim for lost future wages."); *Novovic v. Greyhound Lines, Inc.,* No. 2:09-CV-00753, 2012 WL 252124, at *3 (S.D. Ohio Jan. 26, 2012) (citing *Davila*).

The facts of this case illustrate why immigration status is relevant to a claim for lost wages.  In Ohio, "[i]n order to be recovered, lost wages must be established with reasonable certainty."  *Brady v. Miller*, 2d Dist. No. 18723, 2003 WL 22025969, 2003-Ohio-4582, ¶ 8 (citing *Lingo v. Leeper*, Montgomery App. No. 18856, 2002-Ohio-1205).  Plaintiff's theory of this case is that Popoca should have been taken into custody, booked for driving under the influence, and held in custody until it was safe to release him.  Had that occurred, Popoca's status as an illegal alien could have been discovered, the IRCA would have required his employer(s) to fire him, and he would have faced the risk of being deported.  His future income from the jobs he held at the time of his death would have been reduced to zero.  It would not make sense, therefore, to allow Plaintiff to seek lost wages based on past illegally-earned income without reference to his immigration status.

The Court disagrees with the Deputies, however, that IRCA preempts Ohio's damages statute such that Plaintiff is barred from relying on Popoca's illegally-earned income to establish his claim for damages.  Although not clearly explained in the briefing, the Deputies argue that implied conflict preemption applies in this case.  Conflict preemption "refers to circumstances 'where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and

objectives of Congress.' " *Wimbush v. Wyeth*, 619 F.3d 632, 634 (6th Cir. 2010) (quoting *State Farm Bank v. Reardon*, 539 F.3d 336, 342 (6th Cir. 2008)).  A "[c]onflict preemption analysis 'should be narrow and precise, to prevent the diminution of the role Congress reserved to the States while at the same time preserving the federal role.' " *Id*. (quoting *Downhour v. Somani*, 85 F.3d 261, 266 (6th Cir. 1996)).

It is not impossible to comply with both IRCA and Ohio's damages statute in this case. Under Ohio's damages statute, the jury would receive all evidence relevant to Popoca's earning capacity (including evidence about Popoca's immigration status as well as the wages he earned while employed in the United States) and calculate a damages award.  The jury's consideration of that evidence, and/or the Deputies' payment of any such award, does not make any party's compliance with the IRCA impossible.  Stated differently:  "a lost earnings award to an injured worker does not require the worker or his employer actually to commit or continue to commit an IRCA violation. . . .  At most, the award hypothesizes the continued employment relationship simply as a means of calculating damages to the injured worker."  *Madeira*, 469 F.3d at 247.

The more difficult question is whether applying Ohio's damages statute in this context stands as an obstacle to the accomplishment and full purposes and objectives of Congress. *Hoffman* is relevant to but not dispositive of this issue.  As other courts have noted, the *Hoffman* court was comparing two federal statutes such that federal preemption of state law was not at issue.  *See id*. at 244 (distinguishing *Hoffman*).  Moreover, *Hoffman* involved an employer's termination of an individual's employment that was illegal "only because of the employer's motivation; otherwise, it was effectively required by IRCA."  *Id*.  In other words, it "unduly trench[ed]" upon IRCA to require an employer to compensate an individual for action that IRCA

would have required it to take.  *Hoffman*, 535 U.S. at 151.  Here, in contrast (and obviously), no statute authorizes—much less requires—any party to cause the death of another person.

The Court therefore begins its analysis not with *Hoffman* but by considering the purposes and objectives of IRCA.  The statute is "intended as a 'comprehensive federal statutory scheme for the regulation of immigration and naturalization.' "  *Madeira*, 469 F.3d at 230 (quoting *De Canas v. Bica*, 424 U.S. 351, 353 (1976)).  States are prohibited under the express terms of the statute from "imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."  8 U.S.C. § 1324a(h)(2).

One of the objectives of the IRCA is to prevent undocumented individuals from securing employment.  To that end, the IRCA makes it unlawful for any person "to prepare or provide an application or document, with knowledge or in reckless disregard of the fact that the application or document contains a false, fictitious, or fraudulent statement or material representation."  *Id*. § 1324c(f).  If Popoca forged paperwork as the Deputies claim and used that paperwork to fraudulently obtain employment in the United States, he would have faced criminal prosecution.  *See* 18 U.S.C. § 1546(a).  Section 1546 sets forth specific requirements for the prosecution and the punishment that an individual convicted of such fraud may receive.

The IRCA does not, on its face, require undocumented workers to return wages that he or she earned while employed through fraudulent means if the fraud is discovered.  It therefore cannot be said that a purpose of the statute is to prevent an undocumented individual from keeping the fruits of his or her illegally-secured labor.

The goals underlying Ohio Revised Code § 2125.02 are entirely unrelated to immigration.  This section serves to compensate tort victims by allowing a jury to consider all

evidence relevant to the injured individual's working potential, among other factors.  The question is whether allowing a jury to consider an undocumented alien's past wages earned in the United States and base an award of future damages on expected United States earnings frustrates the purposes and objectives of IRCA.

The Court finds that allowing a jury to consider this evidence does not frustrate the purposes and objectives of IRCA.  As stated above, allowing a jury to compensate an undocumented worker with the compensation he or she likely would have earned addresses a hypothetical issue of compensation between the worker and a third-party tortfeasor.  It does not impact IRCA's goal of preventing that worker from obtaining employment in the first place or denying employment to that worker had he or she remained able to work.  The analysis might be different if IRCA required an undocumented worker to rescind all wages earned under the guise of a false immigration status; however, IRCA contains no such provision.

Moreover, because a lost earnings award is relevant only after an individual becomes a tort victim, there are no perverse incentives in a case like this one that would condone or encourage future violations of the immigration laws.  *Compare Madeira*, 469 F.3d at 248 (discussing the fact that the injury in question was a "disabling personal injury") *with Hoffman*, 535 U.S. at 150 ("[A]warding backpay in a case like this not only trivializes the immigration laws, it also condones and encourages future violations.").  And because a jury must be instructed about the risk of termination and/or deportation that the undocumented worker faced, a compensation award that takes all of these factors into account cannot be said to trivialize the immigration laws.

To reach the opposite conclusion would amount to a finding that, even if an undocumented worker likely would have earned wages in the United States, the Court could

40

punish that worker by rescinding those earnings—*i.e.,* removing those earnings from a compensatory award to his or her estate.  There are many consequences to that course of action.  First, it would turn a state-law tort claim into a mini-trial over the injured worker's conduct and state of mind in securing and presenting immigration paperwork to an employer.  Second, it would permit the Court to sanction an individual without reference to the federal procedure for prosecuting and sanctioning individuals who present false documents.  Doing so would create a state-law penalty in an area in which Congress expressly preempted states from sanctioning employers or creating their own enforcement mechanisms for the immigration laws.  And finally, it would relieve a third-party tortfeasor with no connection to the immigration laws of his or her responsibility to fully compensate the victim of the tort.  Absent explicit direction from Congress that it intended that result, the Court sees no basis for inferring such intent.

In short, the Court finds that IRCA does not preempt Ohio Revised Code § 2125.02 as applied to the issue of an undocumented worker's lost wages.  The Deputies do not offer any additional arguments as to why the Court should preclude such an award.  The Court accordingly **DENIES** the Deputies' motion for summary judgment on this issue.

### III.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Burke and the County's motion for summary judgment in its entirety.  (ECF No. 127.)  The Court **GRANTS IN PART** and **DENIES IN PART** the Deputies' motion for summary judgment.  (ECF No. 125.)  Specifically, the Court grants the motion with respect to Count Three (Intentional Infliction of Emotional Distress) and denies the motion with respect to Counts One (§ 1983 claims pursuant to the Fourteenth Amendment) and Two (wrongful death), as well as the issue of compensatory damages.

**IT IS SO ORDERED**.

/s/ Gregory L. Frost
**GREGORY L. FROST**
**UNITED STATES DISTRICT JUDGE**